## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Clovis Shantez Liggins,<br><br>        Plaintiff,<br><br>   v.<br><br>Jonathan O'Sullivan, Thomas Albertson, Lt. Reicks, and Lt. Murton,<br><br>        Defendants. | Case No. 3:19-cv-50303<br><br>Honorable Iain D. Johnston |

### MEMORANDUM OPINION AND ORDER

Plaintiff Clovis Shantez Liggins brings this action under *Bivens*—and 42 U.S.C. §§ 1983, 1985—against four prison officials at United States Penitentiary Thomson, where he was incarcerated. He alleges that officers O'Sullivan, Albertson, Reicks, and Murton violated his first and fourth amendment rights by confiscating, damaging, and destroying his personal property, verbally and physically threatening him, conducting improper cell and strip searches, and retaliating against him for participating in the prison's grievance process. Defendants now move the Court to dismiss Liggins' suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and, alternatively, based on a theory of qualified immunity. For the reasons explained below, that motion [73] is granted.

### I.    Background

The allegations recited here are taken from Liggins' first-amended complaint. Dkt. 57. At this stage, the Court must accept his allegations as true. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019).

Clovis Shantez Liggins was an inmate at USP Thomson until September 24, 2020, when he was transferred to another federal penitentiary in Texas. He was originally transferred to Thomson as part of a work program, and he was assigned a facilities maintenance job, which included snow removal and lawn mowing. He was not assigned the janitorial job, which was a separate position in the program. On June 6, 2019, Correctional Officers O'Sullivan and Albertson asked Liggins to collect trash in the outdoor recreational area. He refused, explaining that such janitorial services were not his job. Undeterred, the officers insisted. After Liggins asked to speak with a lieutenant about the matter, O'Sullivan became irate, cursed at Liggins, and threatened him physically. The officers did not allow Liggins to speak with a lieutenant.

After this incident concluded, the officers followed Liggins to his cell and conducted an impromptu search. They confiscated some of his property and destroyed other items. They also opened some condiment packets he had in his cell and smeared the contents over some of Liggins' items of clothing. He further alleges that they destroyed sentimental items, including photos of his family and friends.

Later that day, Albertson took Liggins to a private room, locked him in a cage, and asked him to strip completely nude for a strip search. Though Albertson did not create a record of the incident, Liggins filed an administrative complaint. In July 2019, as Liggins' was leaving the dining area, O'Sullivan grabbed him and threw him against the wall. He then took Liggins into another private room and conducted another strip search. During the search, O'Sullivan made Liggins squat,

2

spread his buttocks, and cough multiple times. O'Sullivan allegedly then told Liggins that his problems would go away if he withdrew the administrative complaint. Here again, the correctional officer did not create an incident report documenting the strip search.

On October 12, 2019, two correctional officers escorted Liggins to meet with Lieutenants Reicks and Murton, who then demanded that he withdraw the administrative complaint. Liggins alleges that Murton intimidated him and threatened to beat him, strip search him, take additional items of his property, and then place him in the Special Housing Unit. Murton then put on a pair of latex gloves and told Liggins to remove his coat and pointed out that the room had no cameras in it—Liggins saw this as a reference to the idea that he was about to be strip searched again. Liggins further alleges that Murton explained how he and Reicks could write incident reports however they wanted, and no one would ever question it. After the incident, Murton told Liggins to get out of his office and cursed at him. No incident report was filed. Though Liggins alleges that he did not withdraw the administrative complaint, he also explains that it was never reviewed and returned to him. Because the work program at Thomson ended, Liggins was transferred to Beaumont, Texas, on September 24, 2020.

After filing this action *pro se*, the Court screened his complaint for failure to state a claim and dismissed Lieutenants Murton and Reicks from the case. Dkt. 7. The Court then assigned an attorney to represent Liggins, and his new counsel filed

the now operative first-amended complaint, which added Murton and Reicks back to this suit. Dkt. 57.[1] All Defendants now move the Court to dismiss. Dkt. 73.

## II.    Analysis

Under Rule 8, the plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). The defendant bears the burden on a motion to dismiss to establish the legal insufficiency of the complaint. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545. "But the proper question to ask is still '*could* these things have happened, not *did* they happen.'" *Carlson v. CSX Transp. Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010) (emphasis in original)).

### A.  First Amendment

Defendants argue that Liggins' first amendment retaliation claim must fail because no such claim exists under *Bivens*. The Court need not rehash this analysis.

---

[1] The Court thanks the assigned counsel and his team for their efforts to date in this matter. Their *pro bono* work is appreciated by the Court and, hopefully, by Mr. Liggins.

Courts across the country have consistently held that no claim against federal officials exists for first amendment retaliation under *Bivens*. As this Court has recently explained, "Indeed, it is possible to collect cases collecting cases for this holding." *Sargeant v. Barfield*, No. 19-cv-50187, 2021 U.S. Dist. LEXIS 113597, at *4 (N.D. Ill. June 17, 2021); *see also Piggee v. McMillin*, No. 21-cv-1328, 2022 U.S. Dist. LEXIS 23135, at *7–8 (C.D. Ill. Feb. 9, 2022); *Redmon-El v. Sullivan*, No. 20-cv-50128, 2021 U.S. Dist. LEXIS 188953, at *4 (N.D. Ill. Sept. 20, 2021); *Clark v. True*, No. 20-cv-00049, 2021 U.S. Dist. LEXIS 163418, at *9–10 (S.D. Ill. Aug. 27, 2021). Thus, the Court grants Defendants' motion to dismiss Liggins' first amendment retaliation claim.

### B. Fourth Amendment

Defendants next argue that the Court should dismiss Liggins' fourth amendment claim. Although Congress provided a private right of action to remedy constitutional violations perpetrated by state actors, it has not provided an analogous statute covering claims against persons operating under color of *federal* law. *Piggee v. McMillin*, No. 21-cv-1328, 2022 U.S. Dist. LEXIS 23135, at *3 (C.D. Ill. Feb. 9, 2022). Importantly, the question before the Court is whether to judicially create a right of action in absence of congressional action. Thus, for the purpose of that analysis, the Court assumes, rather than decides, that Liggins' allegations amount to a violation of his constitutional rights. The point here is merely to focus the Court's analysis on whether to imply a right of action, instead of focusing on the egregiousness of the alleged conduct. *See Vance v. Rumsfeld*, 701 F.3d 193, 198 (7th

Cir. 2012) (en banc) ("When considering whether to create an extra-statutory right of action for damages against military personnel who mistreat detainees, we assume that at least some of the conditions to which plaintiffs were subjected violated their rights."). Furthermore, following the Supreme Court's decision in *Ziglar v. Abbasi*, the Seventh Circuit has recognized that the *Bivens* remedy has been substantially narrowed, and much of the Court's prior precedent is no longer binding. *White v. Sloop*, 772 F. App'x 334, 335 (7th Cir. 2019) ("But, since *Abbasi*, the *Bivens* framework has narrowed substantially to limit lawsuits against federal agents; this court's 'past pronouncements are thus not controlling.'").

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court judicially created a cause of action to provide legal redress for a fourth amendment claim. 403 U.S. 388 (1971). In that case, agents of the Federal Bureau of Narcotics performed a warrantless search of Bivens' apartment, arrested him, and threatened to arrest his entire family. *Id.* at 389. In providing Bivens an avenue for legal redress, the Court determined that the judiciary should infer causes of action where necessary to give teeth to constitutional rights. "And 'where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'" *Id.* at 392 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.* at 397 (quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)). And in *Butz v. Economou*,

the Court explained that "*Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." 438 U.S. 478, 504 (1978).

But the rationale of *Bivens* has not survived the years. Now, the Supreme Court discourages judicially created causes of action. "[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017). For that reason, extending *Bivens* beyond the facts of existing Supreme Court precedent is a "disfavored" judicial activity. *Id.* at 1857.

In determining whether to extend *Bivens* beyond its currently limited application, courts must engage in a two-step inquiry. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). First, courts determine whether the claim arises in a new context or involves a new category of defendants. *Id.* If the first inquiry is met, then courts must determine whether any special factors counsel against extending *Bivens* to cover the new context. *Id.*

### 1. New Context

The first step is not an onerous one. The Court must determine whether Liggins' claim provides a new context, or whether it presents the same context as one of the three previously recognized *Bivens* claims. In *Hernandez*, the Supreme Court reiterated that a new context includes a new category of defendants.

7

*Hernandez*, 140 S. Ct. at 743. Furthermore, the universe of circumstances considered "new" is intended to be broad, so that the facts alleged will constitute a new context if they are "different in a meaningful way from previous *Bivens* cases." *Id.* And a claim "may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* The Supreme Court has recognized *Bivens* claims in only three contexts. First, *Bivens* itself was a fourth amendment claim arising out of a purportedly unlawful search of Bivens' apartment by agents of the Federal Bureau of Narcotics. *Bivens*, 403 U.S. at 389. In *Davis v. Passman*, the Court recognized a fifth amendment claim based on sex discrimination. 442 U.S. 228 (1979). Finally, in *Carlson v. Green*, the Court recognized an inmate's eighth amendment claim for deliberate indifference to a serious medical need. 446 U.S. 14 (1980).

The factual allegations in this case present a new context. Although Liggins' contends that his claim does not present a new context, under the Supreme Court's analysis, it undoubtedly does. *Bivens* itself was a fourth amendment claim, but a claim may still arise in a new context even when the same right is invoked. *Hernandez*, 140 S. Ct. at 743. Defendants argue that the context of a prison facility supplies the new context. Dkt. 74, at 14. Liggins admirably makes a plethora of arguments, dkt. 88, at 5–8, but none overcome the simple fact that this case presents a new category of defendants than did Bivens' fourth amendment suit (prison officials rather than Bureau of Narcotics agents), and this fourth amendment claim arises in a new context (a prison rather than a private residence).

8

These are meaningful differences. To be sure, *Carlson*, addressed a prison setting in the context of an eighth amendment inadequate medical care claim. But, according to the Supreme Court, "even a modest extension is still an extension." *Abbasi*, 137 S. Ct. at 1864. In this case, Liggins' fourth amendment claim challenges conduct arguably within the realm of the prison's safety and security procedures, which is considerably different than prison medical care because it implicates different concerns and requires additional deference to prison administrators. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

### 2. Special Factors

If the claim arises in a new context, courts must determine whether special factors instruct against recognizing a new *Bivens* action. *Hernandez*, 140 S. Ct. at 743. Although no exhaustive list of special factors exists, the central analysis is whether the Court would impinge upon the separation of powers by judicially creating a claim where Congress has chosen not to act. *Id.* This analysis includes consideration of whether sound reasons exist "to think Congress might doubt the efficacy or necessity of a damages remedy" and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* (quoting *Abbasi*, 137 S. Ct. at 1857–58). Critically, the question in a *Bivens* analysis is never whether the plaintiff should be afforded a legal remedy. Instead, the question is *who* should decide whether to provide that remedy, "Congress or the courts." *Hernandez*, 140 S.

Ct. at 750. "The correct 'answer most often will be Congress.'" *Id.* (quoting *Abbasi*,

137 S. Ct. at 1857).

The Supreme Court has never specifically defined what it meant by a "special

factor." The Court has, however, instructed that such a factor must "cause a court to

hesitate before answering that question in the affirmative":

> Sometimes there will be doubt because the case arises in a context in
> which Congress has designed its regulatory authority in a guarded way,
> making it less likely that Congress would want the Judiciary to
> interfere. And sometimes there will be doubt because some other feature
> of a case—difficult to predict in advance—causes a court to pause before
> acting without express congressional authorization. In sum, if there are
> sound reasons to think Congress might doubt the efficacy or necessity of
> a damages remedy as part of the system for enforcing the law and
> correcting a wrong, the courts must refrain from creating the remedy in
> order to respect the role of Congress in determining the nature and
> extent of federal-court jurisdiction under Article III.

*Abbasi*, 137 S. Ct. at 1858. And though no exhaustive list of special factors exists,

the Court has found them in many different contexts (e.g., foreign relations and

national security, *Hernandez*, 140 S. Ct. at 744–46; the existence of an alternative

remedy, *Minneci v. Pollard*, 565 U.S. 118, 130–31 (2012); military discipline,

*Chappell v. Wallace*, 462 U.S. 296, 304 (1983), and many others).

As noted above, although the Supreme Court once saw wisdom in judicially

created causes of action, the Court has since abandoned that school of thought as an

extrajudicial, legislative act. And although a previous generation of Justices viewed

*Bivens* in a different light, for decades, the Court has consistently refused to extend

*Bivens* liability to any new context or new category of defendants. *Abbasi*, 137 S. Ct.

at 1857. Moreover, although the majority in *Hernandez* did not overrule *Bivens*, the

Court recognized that had the Court's three *Bivens* cases been decided in 2020, "it is doubtful that [the Court] would have reached the same result." *Hernandez*, 140 S. Ct. at 742–43.

With this directive by the Supreme Court, the Court has no trouble in holding that special factors weigh against extending *Bivens* to provide Liggins a remedy. First, the Supreme Court has repeatedly emphasized the need for deference to prison administrators. *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 398–99 (2015); *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). And although those cases did not address *Bivens* actions, their contemplation of the need for deference to prison officials is no less compelling. As the Supreme Court noted in *Bell v. Wolfish*, "the problems that arise in the day-to-day operations of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. 520, 547 (1979). Here, and without contemplating the merits of Liggins' claim, Liggins' allegations clearly invoke the safety and security of the prison. He complains of strip searches, cell searches, and property destruction. But bodily and cell searches are no doubt part of daily life in a prison specifically because of the prison's need to maintain institutional safety and security. Regardless of the merits of Liggins' claim, this special factor cannot be ignored. And other courts in this Circuit have similarly noted hesitation in further creating *Bivens* remedies in the prison context. *See Piggee v. Watson*, (noting in the

11

first amendment context that exposing prison officials to litigation "would inhibit their discretionary decision-making operations"); *Prucha v. Watson*, No. 2:20-cv-00199, 2021 U.S. Dist. LEXIS 22878, at *8 (S.D. Ind. Nov. 29, 2021) (noting that "courts should hesitate to create *Bivens* remedies in situations concerning prison management").

Furthermore, congressional inaction should be considered a special factor. Congress has certainly expressed a desire to legislate in the prison context and to use the prison grievance process. Indeed, the Prison Litigation Reform Act, 42 U.S.C. § 1997e, gave Congress clear occasion to fashion a statutory remedy.[2] Some courts have rejected this argument. *See, e.g.*, *Mack v. Yost*, 968 F.3d 311, 323–24 (3d Cir. 2020); *Turkmen v. Ashcroft*, No. 02-cv-2307, 2018 U.S. Dist. LEXIS 137492, at *27 (E.D.N.Y. Aug. 13, 2018). Other courts, however, have determined that the congressional decision to forego a statutory remedy in the PLRA should be considered a special factor in a *Bivens* analysis. *Butler v. Porter*, 999 F.3d 287, 294–95 (5th Cir. 2021); *Crocker v. Usp*, No. 5:20-cv-568, 2022 U.S. Dist. LEXIS 18031, at *14–15 (M.D. Fla. Jan. 6, 2022). Indeed, the Supreme Court in *Abbasi* made the same suggestion in dicta:

> Furthermore, legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation. Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This

---

[2] For what it is worth, extraordinary legislative drafting skills are not needed to provide a claim. Congress could simply add a few words to Section 1983: "or the United States". Political will, not drafting ability, is the roadblock.

> Court has said in dicta that the Act's exhaustion provisions would apply to *Bivens* suits. But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Abbasi*, 137 S. Ct. at 1865 (citations omitted). Thus, the Court holds that the existence of the PLRA and Congress' decision to forego a statutory remedy, as well as the general need to defer to prison administrators on matters of institutional safety and security, are special factors that cause the Court to hesitate.

Because *hesitation* is all that is needed, *Hernandez*, 140 S. Ct. at 743, the Court declines to extend *Bivens* to cover Liggins' fourth amendment claims. Thus, he has not stated a claim under *Bivens*, and the Court must grant Defendants' motion to dismiss with prejudice.[3]

## C. Sections 1983 and 1985

Liggins also asserts a claim under 42 U.S.C. §§ 1983 and 1985(3). Dkt. 57, ¶ 52. Defendants move to dismiss the claims because they are federal, and not state, employees. Dkt. 74, at 3. In response, Liggins concedes that such an action cannot lie here under § 1983 and clarifies that any reference to section 1983 was made in error. Dkt. 88, at 2 n.1.[4] Thus, the Court dismisses any claim under 42 U.S.C. § 1983 with prejudice.

---

[3] The Court is driven to this conclusion despite compelling policy considerations counseling otherwise. *See Byrd v. Lamb*, 990 F.3d 879, 883 (5th Cir. 2021) (Willett, concurring). Again, the issue is which branch of the federal government should provide a right of action. *In this context*, Supreme Court jurisprudence requires Congress to do so. Entering orders like this is part of the job requirements of a federal judge, but to say doing so causes "unease", *id.* at 884, is an understatement.

[4] The Court appreciates counsel's refreshing candor in this regard.

Count III of Liggins' first-amended complaint pleads a claim of conspiracy to violate Liggins' first and fourth amendment rights. Liggins explicitly brings this claim under 42 U.S.C. § 1985. Dkt. 57, ¶¶ 64–68. Section 1985(3) provides an avenue for legal redress if the defendants have allegedly conspired to deprive plaintiffs of their rights or privileges: "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." § 1985(3). Defendants contend that § 1985(3) does not apply to federal officials. And even if it does, they contend that the intracorporate-conspiracy doctrine applies, so that they could not have conspired with each other. Dkt. 74, at 3–4. In the alternative, Defendants further contend that Liggins has failed to state a claim under § 1985(3).

Whether 42 U.S.C. § 1985(3) applies to defendants acting under color of federal authority—rather than under color of state authority—has never been squarely addressed by the Seventh Circuit. In *Ziglar v. Abbasi*, the Supreme Court assumed that § 1985(3) applies to federal officials. 137 S. Ct. 1843, 1867–69 (2017). More than forty years ago, a court in this district held that—unlike § 1983—§ 1985(3) does apply to defendants acting under color of federal authority. *Alvarez v. Wilson*, 431 F. Supp. 136, 142 (N.D. Ill. 1977) ("Thus, as applied to racially motivated conspiracies, § 1985(1), like § 1985(3), is a restraint upon federal officers and private organizations, as well as state action."). In *Benson v. United States*, a Northern District of Illinois court again held the same. 969 F. Supp. 1129, 1135

14

(N.D. Ill. 1997) ("Section 1985 does not have the same state action requirement.");
*see also Green v. Warden*, No. 07-C-37-C, 2007 U.S. Dist. LEXIS 12809, at *8 (W.D.
Wis. Feb. 21, 2007) ("Claims of conspiracies to effect deprivations of civil or
constitutional rights may be brought against federal officials under *Bivens* or 42
U.S.C. § 1985(3)."). Furthermore, Congress knows how to write a statute that
requires *state* action. It did so in 42 U.S.C. § 1983. That requirement is absent from
the plain text of § 1985. Although not addressing the question squarely, the
Supreme Court in *Griffin v. Breckenridge*, held that this textual omission must be
seen as an indication that Congress intended to protect against *all* conspiratorial
deprivations of equal protection "whatever their source." 403 U.S. 88, 97 (1971).
Therefore, the Court holds that § 1985(3) applies to defendants acting under color of
either federal or state authority.[5]

Defendants next contend that the intracorporate conspiracy doctrine bars
Liggins' suit because they all work for the same governmental entity. Dkt. 74, at 4–
5. In *Abbasi*, the Court recognized that the courts of appeal are split on the question
of whether the intracorporate conspiracy doctrine applies to claims brought under §
1985(3). *Id.* at 1867. Although the Court declined to answer the question, it noted
reasons to conclude that the doctrine should apply. *Id.* at 1868 ("Nothing in this
opinion should be interpreted as either approving or disapproving the
intracorporate-conspiracy doctrine's application in the context of an alleged

---

[5] Defendants cite to *United Brotherhood of Carpenters & Joiners, Local 610 v. Scott*, 463
U.S. 825 (1983) for the proposition that 42 U.S.C. § 1985(3) does not apply to federal actors.
But as explained above, subsequent federal courts have not interpreted that case to stand
for such a proposition, nor was the Supreme Court specifically asked that question.

§1985(3) violation. . . . Close and frequent consultations to facilitate the adoption and implementation of policies are essential to the orderly conduct of governmental affairs. Were those discussions, and the resulting policies, to be the basis for private suits seeking damages against the officials as individuals, the result would be to chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies.").

Liggins responds that the intracorporate conspiracy does not apply in this case because Defendants are sued in their individual capacities. Dkt. 88, at 13. The argument is not well developed, and Liggins cites no cases for the proposition that the intracorporate conspiracy doctrine only applies in official capacity suits. And *Ziglar v. Abbasi* does not help. It is true the Supreme Court stated, "When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal." *Abbasi*, 137 S. Ct. at 1867. But, although the Supreme Court used the "official duties" and "official capacities" language, Liggins cites no cases interpreting *Abbasi* to hold that intracorporate conspiracy doctrine applies only to cases in which the plaintiff sues defendants in their official capacities.

Instead, the point is that the intracorporate conspiracy doctrine only applies when the defendants allegedly acted within the scope of their employment. As the Supreme Court in *Abbasi* pointed out, the circuits disagree whether intracorporate conspiracy doctrine applies in the § 1985 context. *Abbasi*, 137 S. Ct. at 1868. But when discussing the doctrine in the context of government official defendants,

16

speaking of those defendants' "official duties" is no different than referring to a private defendants' "scope of employment."

The theory underpinning conspiracy doctrine is that for a conspiracy to exist two or more separate persons must work together to achieve a common goal. *Hartman v. Bd. of Trustees of Community College Dist. No. 508*, 4 F.3d 465, 470 (7th Cir. 1993). But separate persons do not work together to achieve a common goal if those separate persons act as agents on behalf of the same principle. *Id.* ("But if the challenged conduct is essentially a single act of discrimination by a single entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute."); *Haliw v. City of South Elgin*, 2020 U.S. Dist. LEXIS 47329, at *9 (N.D. Ill. Mar. 18, 2020) ("Under this doctrine, employees of the same corporate entity cannot be liable under a conspiracy theory if the employees act within the scope of their employment.").

With this underlying rationale in mind, the Court must grant Defendants' motion to dismiss Liggins' § 1985(3) claim. Liggins fails to illuminate any allegations, taken as true, that show Defendants were acting outside the scope of their employment.[6] Indeed, Liggins' complaint squarely alleges that the Defendants were acting in the scope of their employment during the relevant conduct. Liggins' argument seems to assume that all individual capacity claims invoke the exception

---

[6] Many of the cases on intracorporate conspiracy doctrine in the § 1985(3) context contemplate qualified immunity, due to the unsettled nature of the law on this question. Here, however, Defendants' have not argued that they are qualifiedly immune from suit under § 1985(3). Their qualified immunity argument is, instead, confined to the merits of Liggins' first and fourth Amendment claims. Thus, the Court does not consider qualified immunity in the § 1985(3) context.

to the intracorporate conspiracy doctrine because those defendants must necessarily have been acting extralegally. In support, Liggins cites *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000). But that case had nothing to do with conspiracy, § 1985, or the intracorporate conspiracy doctrine. Thus, because Liggins has not cited any legal authority for his proposition, he has not developed the argument, so it is waived. *Martinez v. Colvin*, 12 CV 50016, 2014 U.S. Dist. LEXIS 41754, at *26–27 (N.D. Ill. Mar. 28, 2014). And because the argument would seemingly dispose of the intracorporate conspiracy doctrine in all § 1985 individual capacity claims, the Court declines to follow it here. *See Williams v. Cook County*, No. 05 C 6351, 2006 U.S. Dist. LEXIS 44443, at *11 (N.D. Ill. June 29, 2006) (applying intracorporate conspiracy doctrine in an individual capacity suit because defendants were members of the same governmental entity).

Regardless of whether the intracorporate conspiracy doctrine applies in this case, the Court would also dismiss Liggins' claim for failure to state a claim. Defendants argue that Liggins failed to "allege a race or other class-based discriminatory motive." Dkt. 74, at 10. Liggins responds that "Defendants engaged in conduct motivated by discriminatory animus toward a *protected* activity: filing a complaint." Dkt. 88, at 13. In support, Liggins contends that "class-based" language in § 1985(3) is not defined in the same way as it is in Title VII actions. Instead, Liggins asserts that "class-based" is defined based on its plain meaning: "a group, set, or kind sharing common attributes." *Id.* Liggins, however, cites no cases supporting such a broad definition or cases that have held that prisoners filing

18

administrative complaints can be a class within the meaning of § 1985(3). On the contrary, at least one Supreme Court case implies the opposite. In *United Brotherhood of Carpenters & Joiners, Local 610 v. Scott*, the Court determined that § 1985 was not "intended to reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities." 463 U.S. 825, 837 (1983) (emphasis in original). In that case, the proposed § 1985(3) class was nonunion workers—a group that would undoubtedly fall within the scope of Liggins' proposed broad definition of a "class." More recently, the Seventh Circuit affirmed the dismissal of a § 1985(3) claim because "[g]raduates of foreign veterinary schools are not a protected class cognizable based on race or national origin." *Gunawardana v. Am. Veterinary Med. Ass'n*, No. 21-1330, 2021 U.S. App. LEXIS 31941, at *8 (7th Cir. Oct. 25, 2021). The same is true here. Prisoners that file administrative complaints may share common attributes, but they do not constitute a protected class within the meaning of 42 U.S.C. § 1985(3).

Thus, because Liggins does not allege any conspiratorial denial of equal protection based on his membership in a protected class, the Court must grant Defendants' motion to dismiss his claim under 42 U.S.C. § 1985(3).

## III.   Conclusion

For the reasons explained above, Defendants' motion to dismiss [73] is granted. Furthermore, the Court dismisses his claims under *Bivens* and 42 U.S.C. § 1983 because such avenues for relief are not available to Liggins. Thus, those dismissals are with prejudice. The Court dismisses Liggins' claim under 42 U.S.C. §

19

1985(3) without prejudice, however. The Court will not assume that this claim is irreparable. If Liggins believes he can amend his complaint to properly allege a claim under 42 U.S.C. § 1985(3) consistent with this order and his obligations under Federal Rule of Civil Procedure 11, he may do so by April 15, 2022. If Liggins declines to amend by that date, the dismissal will become with prejudice.

Date: March 15, 2022

Honorable Iain D. Johnston
United States District Judge